IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JOHNNY JUNIOR CRAWFORD                                              PLAINTIFF

v.                                    Civil No. 4:19-cv-04021

SHERIFF JAMES SINGLETON, Hempstead County,
Arkansas; LIEUTENANT HEATH ROSS; and
DEPUTY JERRY CRIDER                                                 DEFENDANTS

## REPORT AND RECOMMENDATION

This is a civil rights action filed *pro* se by Plaintiff, Johnny Junior Crawford, under 42

U.S.C. § 1983. Before the Court is a Motion for Summary Judgment filed by Defendants. (ECF

No. 28). Plaintiff has filed a Response. (ECF Nos. 40-42). Pursuant to the provisions of 28 U.S.C.

§ 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, Chief United States District Judge,

referred this case to the undersigned for the purpose of making a Report and Recommendation.

## I. FACTUAL BACKROUND

Plaintiff is currently incarcerated in the Arkansas Department of Correction ("ADC"),

Ouachita River Unit. His claims in this action arise from alleged incidents that occurred during

his arrest in February of 2016 and subsequent incarceration in the Hempstead County Detention

Center ("HCDC").

On February 16, 2016, Plaintiff was arrested and booked into the HCDC and charged with

aggravated robbery, possession of a firearm by certain persons, driving while intoxicated, and

refusal to submit to a chemical test. (ECF No. 30-2, pp. 5-12). The Hope Police Department's

report on Plaintiff's arrest includes multiple witness narrative summaries, notes from detectives,

and photos of the scene of the arrest. (ECF No. 30-4). In addition, Corporal Dennis Hovarter, a

Wildlife Officer with the Arkansas State Game and Fish Commission who responded to the

incident, submitted a report dated February 20, 2016 stating:

> On 2-16-16, I had just pulled up at the Hope Regional Office, when the Hope dispatcher advised of a bank robbery in progress at the Bank of the Ozarks on Hervey street in Hope. The dispatcher stated that the suspect was an older white male with a red and white checkered shirt on and he was armed with a black handgun. He was driving a blue Ford Explorer with Texas tags GLD-6293.
>
> I left the office and started towards town on Hwy 67. When I got to the intersection of Hwy 67 and Bill Clinton Bypass, I stayed at the location until we could get a direction of travel. As I was sitting there, an off duty Hempstead county deputy advised on the radio that he met a vehicle matching that description heading south on Main street. He said that he was turning around to see if the tags matched. When he got back behind the vehicle, he stated that it was the suspect vehicle and that it was turning North onto Bill Clinton Bypass. At this point, I knew that the suspect was headed in my direction so I pulled out and positioned my truck facing North.
>
> As the suspect vehicle approached, I fell in behind it to confirm that it was the vehicle. I also noticed that there was an older white male driving with a red and white checkered shirt on. At this point, I activated my emergency lights and conducted a Felony traffic stop on the vehicle. I advised Hope dispatch of my location and that I had the vehicle stopped. I waited in my truck until other units arrived on scene. As I was waiting, I could see the suspect looking at me in his rearview mirror. As other units showed up, I exited my vehicle and began to give the driver commands. He complied with all commands and was taken into custody without incident. I then notified my dispatch in Mayflower of the situation.
>
> After an inventory of the vehicle, the handgun was found in the passenger side floorboard. It was a Highpoint 9mm that was loaded. The money that the suspect stole was found in the back floorboard in a blue bag. It totaled 11,842 dollars.

(ECF No. 30-4, p. 1). Plaintiff's booking information from the HCDC lists Officer Ghormley as the arresting officer, Officer Joshua Pendergrass as the Searching Officer, and Officer Austin turner as the Intake Officer. (ECF No. 30-2, p. 9).

At the time of Plaintiff's arrest, the Hope Police Department utilized dash cams on police vehicles. (ECF No. 30-6, video filed conventionally with the Court as Dash Cam Unit #220). Officer Ghormley is heard on the dash cam asking Plaintiff, "What's hurting?" *Id.* at 6:03. Plaintiff responds, "The cuff…real bad." *Id.* at 6:03-6:10. Officer Ghormley then says, "Alright,

go ahead and step out for me, and I'll look at them for you. *Id.* at 6:11-14. Plaintiff is heard saying, "I'm telling you they're way too tight." *Id.* at 6:17-17. Officer Ghormley says, "That's why I said I'm going to look at them for you." *Id.* at 6:17-19. She then instructs Plaintiff to stand up and turn straight around and then states, "No, they're not too tight on you." *Id.* at 6:39-42, 54. Plaintiff replies, "Oh they're hurting," to which Officer Ghormley asks "which one, this one?" *Id.* at 6:57-7:00. Plaintiff responds, "The right one." *Id.* at 7:00. Officer Ghormley then states, "I can get a finger in there, it's not too tight, I promise you. They're not comfortable, I know it, but I can get a finger inside of both of them, okay?" *Id.* at 7:02-10. Officer Ghormley then transports Plaintiff to the HCDC.

Upon arrival at the HCDC, an officer/arrestee observation form was completed. It was noted there were no physical injuries to Plaintiff. (ECF No. 30-3, p. 1). On the HCDC's intake form, the following question was asked: "Does the arrestee have pain or injury requiring emergency care?" The booking officer noted, "No." *Id.* at p. 3. Both Plaintiff and the booking officer signed the bottom of this form. *Id.*

On February 25, 2016, Plaintiff submitted a medical request stating, "Called for falling out of the lawn-no report of any injury." (ECF No. 30-3, p. 4). In response, Plaintiff was seen by medical staff that day and was prescribed medicine. *Id.* On March 27, 2016, Plaintiff submitted a medical request stating, "Runny nose, fever, sore throat, diarrhea". (ECF No. 30-3, p. 5). On April 3, 2016, Plaintiff was examined by medical personnel who noted, "c/o runny nose, sore throat, greenish tinged drainage. Diagnosis: Allergies Vs Sinusitis. Prescription: cephalexin 500 mg…" *Id.* On November 5, 2016, Plaintiff was transported to Wadley Regional Medical Center for chronic obstructive pulmonary disease with acute exacerbations. (ECF No. 30-9, p. 7). On January 20, 2017, Plaintiff was transported to Wadley Regional Medical Center for acute

3

bronchitis and acute upper respiratory infection.  (ECF No. 30-9, p. 6).  Plaintiff did not mention his wrist injury in the medical requests or during his hospitalizations.

On January 25, 2017, Plaintiff submitted a medical request stating, "I have a damaged blood vessel from when my arrest originated from over a year ago. I have sent 3 medical requests and not received an answer back yet."  In response, Plaintiff was seen by medical staff on January 27, 2017, and it was noted, "right wrist 0.5 cm x 0.5 cm raised discoloration purplish grey in area – firm – (palm rt side) non-tender…"  For Plaintiff's diagnosis medical personnel noted: "Rt wrist calcification cyst," and there were no notations regarding any action to be taken for this condition. (ECF No. 30-3, p. 6).

On March 10, 2017, Plaintiff was seen by HCDC medical staff because he was complaining of pain.  The medical staff noted, "Hx RA – Start (illegible) 600 bid."  (ECF No. 30-3, p. 7).  On April 7, 2017, Plaintiff was transported from the HCDC to Wadley Regional Medical Center for chest pain, altered mental status, atrioventricular block, and abnormal electrocardiogram.  (ECF No. 30-9, pp. 4-5).  The following day, Plaintiff was transported from Wadley Regional Medical Center to Baptist Health Medical Center in Little Rock for evaluation of syncopal episode with hypotension.  (ECF No. 30-10, p. 2).  He was then transported by ambulance to the Emergency Room at Baptist Health for a urinary tract infection, facial weakness, cyst of kidney, dehydration, heart disease, a hernia, and diverticulosis of large intestine.  *Id.* at p. 1.  Then on April 10, 2017, Plaintiff was transported to Wadley Regional Medical Center in Hope for medical consultation on noninfective gastroenteritis and colitis.  (ECF No. 30-9, p. 2).  During this time, Plaintiff did not complain about any injury to his wrist.

On June 5, 2017, Plaintiff was released from the HCDC to the ADC.  (ECF No. 30-2, p. 9).  On October 3, 2017, Plaintiff was examined by ADC medical personnel who noted, "2x3x1

4

cm vascular malformation on right wrist where IM had handcuff injury on arrest." There was no medication or treatment prescribed for Plaintiff's wrist at that time. (ECF No. 30-11, p. 18). On December 27, 2017, Plaintiff was examined by ADC medical personnel who noted, "2x3x1 cm vascular malformation on right wrist where IM had handcuff injury on arrest." There was no medication or treatment prescribed for his wrist. (ECF No. 30-11, p. 17).

On March 5, 2018, Plaintiff was examined by ADC medical personnel who noted, "deformed/engorged vein noted right wrist – IM on blood thinners." (ECF No. 30-11, pp. 19-20). On March 8, 2018, Plaintiff was examined by ADC medical personnel who noted, "right wrist varicose vein." (ECF No. 30-11, p. 16). On April 19, 2018, Plaintiff was examined by ADC medical personnel who noted, "2x3x1 cm vascular malformation on right wrist where IM had handcuff injury on arrest." There was no medication or treatment prescribed for the wrist at that time. (ECF No. 30-11, p. 12-13).

On July 9, 2018, Plaintiff was seen by medical staff at the ADC. The medical staff noted:

Patient having low back pain and flank pain. He saw Dr. Breving who stated the device [IVC filter] can come out & probably should. Breving said he could do the surgery on Coumadin. D. Breving also saw the patient about basal cell on face and ganglionic cyst on right wrist that needs to be fixed as well. Wrist can wait but basal cell cannot.

(ECF No. 30-11, p. 11). On July 17, 2018, Plaintiff was examined by ADC medical personnel who noted, "large right wrist ganglion cyst...Consider remove ganglion cyst at another time." (ECF No. 30-11, p. 10).

On August 31, 2018, Plaintiff was unable to be transported for a medical appointment and it was noted, "Per Vowell inmate is non-emergent and can be rescheduled to 10/10/2018. Transportation could not make all the runs. 1st one available with Dr. Breving." (ECF No. 30-11, p. 23). On October 10, 2018, Plaintiff's ADC records note, "Inmate signed NPO sheet and waited

until he got to NPMC and told them he ate.  Procedure will be rescheduled.  Inmate reschedule with the 1st available that Dr. Breving had."  (ECF No. 30-11, p. 23).  On October 18, 2018, Plaintiff was examined by ADC medical personnel who noted, "Dr. Breving is going to remove patient's basal cell carcinoma, ganglionic cyst on right wrist, as well as his IVC filter in November. Patient ate this month & therefore Dr. Breving was unable to do the procedure."  (ECF No. 30-11, pp. 8-9, 22-23).

On November 20, 2018, Dr. Vowell cancelled Plaintiff's appointment, and it was noted, "Appointment cancelled per Dr. Vowell.  Per Dr. Harrison inmates IVC filter should not be removed and inmate does not want it removed and Dr. Breving said inmate needs to see a dermatologist to remove Basal Cell Carcinoma from cheek."  (ECF No. 30-11, p. 23).  On January 4, 2019, Plaintiff was examined by ADC medical personnel who noted, "2x3x1 cm vascular malformation on right wrist where IM had handcuff injury on arrest."  There was no medication or treatment prescribed for the wrist.  (ECF No. 30-11, pp. 2-3).  On April 8, 2019, Plaintiff was examined by ADC medical personnel who noted, "2x3x1 cm vascular malformation on right wrist where IM had handcuff injury on arrest."  There was no medication or treatment prescribed for the wrist.  (ECF No. 30-11, p. 2-3).

## II. HCDC's POLICIES AND PROCEDURES

The HCDC has policies in place regarding the operation of the facility and the treatment of inmates including but not limited to a procedure for filing grievances or complaints.  (ECF No. 30-5).  This procedure is to be followed by Detention Officers and inmates.  When an inmate has a complaint, a grievance will be filed and forwarded to the Detention Officer who will then forward the grievance to the Shift Supervisor.  If the inmate is not satisfied with the response of the Shift Supervisor, then he/she may appeal the grievance to the Detention Administrator.  If the inmate

wishes to file a complaint against the Shift Supervisor, the grievance may be filed directly to the Detention Administrator. *Id.* at p. 6.

To accomplish lawful objectives, employees of the HCDC are required to use the type and degree of force which is reasonable and necessary based on the circumstances. (ECF No. 30-5, pp. 3-5). The HCDC's policy acknowledges its deputies will occasionally be required to use force when making an arrest. The level of force required when making an arrest is to be based upon the following factors: (1) Psychological Intimidation – non-verbal clues indicating a subject's attitude, appearance, and physical readiness; (2) Verbal Non-Compliance – verbal responses indicating belligerent unwillingness or threats; (3) Passive Resistance – physical reactions of the subject that do not prevent the deputies attempt of control; (4) Defensive Resistance – physical actions, which attempt to prevent the deputies' control, but never attempt to harm the deputy; (5) Active Aggression – actions indicating intent to cause harm or disregard for the deputy's safety; and (6) Aggravated Active Aggression – a physical assault and/or the use of deadly force. *Id.*

The HCDC's policy concerning force includes a set of guidelines to further define the types of force and specific level of control that may be used to overcome resistance, control persons in custody, and prevent their escape. The Hempstead County Sheriff's Office mandates the recognition of the following Use of Force Continuum: (1) Command Presence – A Deputy's presence and identification of authority; (2) Verbal direction – Verbal Directions or voice commands; (3) Aerosol Spray Weapons that contain OC or OCCS, including the JPX450; (4) Soft Hands Techniques – Takedowns and/or control techniques, K-9, and Electronic Control Devices (TASER); (5) Intermediate Weapons – SIM's Expandable ADP Baton; Riot Baton, Flashlight, 37mm and hand deployed specialty munitions – may be used on non-lethal areas of the body; (6) Deadly Force – Use of Firearms or other weapons in a reasonable manner and in accordance with

Department Police and State Law.  (ECF No. 30-5, pp. 4-5).

The HCDC's policy instructs its employees [Deputies and others] to escalate or de-escalate their use of force in direct response to the other person's actions.  Employees are reminded there will be occasions when the use of force continuum cannot be followed due to circumstances beyond the employee's control.  (ECF No. 30-5, p. 5).  According to policy, Deputies "may draw or display firearms when there is a threat or a reasonable belief that there is a threat to life or when they have a reasonable fear for their own safety and/or the safety of others.  (ECF No. 30-5, p. 3).  With few exceptions, all prisoners shall be handcuffed, double locked and checked for proper application, with their hands behind their back.  (ECF No. 30-5, p. 7).

The HCDC also has policies and procedures in place regarding health care for its inmates.  The policy states all inmates shall be entitled to health care comparable to that available to citizens in the surrounding community and medical care at the HCDC shall be delivered under the direction of a licensed physician.  In addition, the policy provides no officer or other employee shall ever summarily or arbitrarily deny an inmate's request for medical services.  (ECF No. 30-5, p. 1).

At the HCDC inmates can make medical complaints daily for review by qualified medical personnel to ensure appropriate medical attention.  Inmate requests for medical care are to be documented on a "Request Slip".  The slips are to be provided by the Detention Officer upon request and must be collected the day they are requested.  The HCDC facility physician visits the facility to examine those inmates who require his/her attention.  The ranking officer on duty must prepare the list of inmates requiring medical attention.  (ECF No. 30-5, p. 2).

In accordance with policy, the HCDC facility physician records all examinations, treatments, "etc." in the inmate's medical file.  The HCDC officer shall file all medical complaint slips and shall note the inmate's sick call visits on the daily log.  Any orders given by the facility

8

physician for an inmate shall be attached to the inmate's file with an accompanying notation made of the log. A detention officer on each shift shall be responsible for checking the log and following all physicians' orders noted. (ECF No. 30-5, p. 2).

### III. PROCEDURAL BACKGROUND

On February 20, 2019, Plaintiff filed the instant lawsuit against Sheriff James Singleton, Lieutenant Heath Ross, and a "John Doe (unnamed person)". (ECF No. 1). Plaintiff states he did not present the facts set forth in his Complaint in a written prisoner grievance procedure at the HCDC noting, "I attempted to do that, but I was denied that right to complain through that process." *Id.* at p. 2. He claims Defendant Ross "stated that he was not going to allow me to complain anymore, because the SHERIFF DID NOT NEED anymore lawsuits put on him, so he refused to give me a grievance form." *Id.*

In Claim One of the Complaint, Plaintiff alleges Defendant John Doe used excessive force against him when he was arrested on February 16, 2016, after he had just robbed the Bank of Ozarks in Hope, Arkansas, and was leaving town. Plaintiff specifically alleges, "…Mr. John Doe, a Hempstead County Sheriff's Deputy pulled me over and was pointing his gun at me…he then made me get out of my vehicle… he grabbed and he 'slammed' me into the side of his own vehicle and as he was in the process of putting his 'cuffs' on me, he 'slammed' his 'cuffs' on me way too hard." (ECF No. 1, pp.4-5). Plaintiff goes on to state he "calmly asked him to loosen them [cuffs] up…it was hurting really bad (as he had cuffed me with my hands behind my back)…" *Id.* at p. 5.

Plaintiff states the cuffs remained on his wrists for approximately thirty (30) minutes when they were removed at the "jail". He claims as a result of being cuffed too tightly, he sustained "severe, permanent physical injury to my right wrist area which remains swollen-up…to this very

9

day." *Id.*  Plaintiff also states, "at no time during this 'arrest' did I resist at any time…my hands were 'handcuffed' behind my back at all times…" *Id.* at p. 6.

In the Complaint, Plaintiff provided the following description of Defendant John Doe: "…gray-haired caucasian male, probably in is fifties…he received a reward for the arrest…" (ECF No. 1, p. 6.  On March 26, 2019, in response to this Court's order, Defendants Singleton and Ross identified the John Doe officer as Deputy Jerry Crider.  (ECF No 12).  Plaintiff specifically states, "John Doe is the only one of the Defendants who used 'excessive' force on me." *Id.* p. 7.

Plaintiff also asserts an official capacity claim against Defendant Crider alleging "from what I've been hearing this wasn't the first time…John Doe and this Hempstead County Sheriff's Dept. was accused of using 'excessive…force when they make arrests…It's 'historically' a part of the Sheriff's Dept. 'culture' and an on-going pattern, practice, etc." *Id.*

In Claim Two, Plaintiff alleges "from 2-16-2016 to the time I was sent to prison [the ADC], which was almost a year…", Defendants Singleton and Ross denied him medical care for his injured right wrist.  (ECF No. 1, pp. 9-11).  Plaintiff states he "personally talked to Sheriff Singleton on numerous occasions about my wrist injury and I showed it to him…Sheriff Singleton 'deliberately' refused my requests and made sure no medical professional saw my injured 'wrist'." *Id.* at p. 10.  As for Defendant Ross, Plaintiff claims when he arrived at the HCDC, "I showed my injured rt. Wrist to Lt. Ross, he kept 'putting me off' and he never ever got me any medical attention or medial treatment…I was never seen by any doctor nurse. I guess on their 'orders'. *Id.*

As for his official capacity claims Plaintiff states, "…Singleton made sure that no one provided me any kind of medical attention or treatment…it was a part of the County jails 'culture', pattern and practice of denying us prisoners adequate medical care and treatment." (ECF No. 1, p. 10).  Plaintiff alleges Defendant Ross "allowed this bad 'culture' to exist and he made sure that

no other staff member would help get me medical attention…" *Id.* at p. 11.  Plaintiff is seeking compensatory and punitive damages.  He specifically states, "I'd like to sue for one-million dollars from each Defendant for my 'pain and suffering'…"  (ECF No. 1, p. 12).

On November 15, 2019, Defendants filed a Motion for Summary Judgment arguing they are entitled to summary judgment because: 1) Plaintiff failed to exhaust his administrative remedies; 2) there is no proof of any personal involvement by Defendants Singleton or Crider; 3) Plaintiff was not subjected to excessive force during his arrest; 4) Defendants were not deliberately indifferent to Plaintiff's serious medical needs; 5) Defendants are entitled to qualified immunity; and 6) there is no unconstitutional policy implemented by Defendants that violated Plaintiff rights. (ECF No. 28).

On February 26, 2020, Plaintiff filed a Response in opposition to Defendants' motion. (ECF No. 40).  Plaintiff argues: 1) Defendants Singleton and Ross "denied him the necessary grievance forms and, as a result, he lacked 'available' administrative remedies"; 2) Defendants were all personally involved in a violation of Plaintiff's constitutional rights; 3) Defendant Crider used excessive force on Plaintiff when he "slammed" the handcuffs on him and the cuffs were "overly tight"; 4) Plaintiff's wrist injury is more than a de minimus injury; 5) Defendants Ross and Singleton were deliberately indifferent to his serious medical needs; 6) Defendants are not entitled to qualified immunity; and 7) Defendants failed to comply with implemented policies.  In addition, Plaintiff submitted an affidavit stating he spoke with Defendants Ross and Singleton informing them of his desire to file a complaint against the "deputy that injured my wrist during my arrest" and he was never provided a grievance form or informed about the HCDC's policy and procedure that it was my responsibility to file the grievance."  *Id.* at pp. 17-18.

## IV. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing, *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## V. DISCUSSION

### A. Failure to Exhaust Administrative Remedies

Defendants argue Plaintiff failed to exhaust his administrative remedies on his claims of excessive force and denial of medical care before he filed the instant lawsuit and consequently his claims are barred.

The Prison Litigation Reform Act ("PLRA") in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."    Exhaustion is mandatory.    *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).  In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Id*. at 218 (internal quotation marks and citation omitted).  The Court stated the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id*.

The Eighth Circuit has recognized two exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures; or (2) when the officials themselves fail to comply with the grievance procedures.  *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (citing *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001) (explaining a prisoner is only required to exhaust those administrative remedies that are available and any remedies that prison officials prevent a prisoner from utilizing are not considered available)).

There is no dispute the HCDC had a grievance procedure in place for detainees to use at the time the incidents occurred which Plaintiff claims resulted in a violation of his rights.   (ECF No. 20-5).  The summary judgment record confirms, and Plaintiff admits, he did not file any grievances related to the use of excessive force during his arrest or the denial of medical care prior to filing the instant Complaint.  However, Plaintiff alleges in his Complaint and has provided the

Court with an affidavit stating Defendants Ross and Singleton refused to provide him with grievance forms and never informed him about the HCDC's grievance procedure.

Accordingly, the Court finds there is a question of material fact as to whether Defendants Ross and Singleton prevented Plaintiff from utilizing the HCDC's grievance procedure. Therefore, I recommend summary judgment be denied on Defendants' claim regarding Plaintiff's failure to exhaust his administrative remedies.

### B. Personal Involvement of Defendants

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability on the part of a defendant, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (citation and internal quotation marks omitted). Defendants argue neither Singleton nor Crider had any personal involvement in the alleged violation of Plaintiff's rights.

At the time of the events in question Defendant Singleton was the Sheriff of Hempstead County. Although general responsibility for supervising a detention center is insufficient to establish personal involvement, *Reynolds v. Dormire*, 636 F.3d 976, 981 (8th Cir. 2011), Plaintiff alleges he spoke with Defendant Singleton about his injured wrist and requested medical care for his condition on several occasions. He claims in his verified Complaint Defendant Singleton not only ignored his requests but intentionally kept him from obtaining medical care.

Defendant Crider has submitted an affidavit stating he did not have any physical contact with Plaintiff during the arrest. In addition, Defendants point out during his deposition Plaintiff could not positively identify Defendant Crider's photo as the man who handcuffed him during his arrest. However, it was Defendants who identified Crider as the deputy who was involved in

Plaintiff's arrest in response to Plaintiff's physical description of the individual who handcuffed him.

Accordingly, the Court finds there is a question of fact as to whether Defendants Singleton and Crider were personally involved in the alleged violation of Plaintiff's rights. Consequently, the Court recommends Defendants' motion for summary judgment based on the lack of personal involvement by Defendants Singleton and Crider be denied.

### C. Excessive Force

Plaintiff alleges Defendant Crider used excessive force against him during his arrest on February 16, 2016, when he slammed handcuffs on him that were overly tight and pushed him up against a vehicle causing "minor" injuries to his face.[1]

Where an excessive force claim arises in the context of an arrest, it is most properly characterized as one invoking the protections of the Fourth Amendment. *See Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). In evaluating an excessive force claim under the Fourth Amendment, a court must consider whether the force was objectively reasonable under the circumstances, "rely[ing] on the perspective of a reasonable officer present at the scene rather than the '20/20 vision of hindsight.'" *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386 (1989)). The application of this standard requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham,*

---

[1]Plaintiff states in his Response he "also suffered minor injuries to the left side of his face and forehead during his arrest when his face was shoved to the ground on the asphalt that had loose gravel on it." (ECF No. 40, p.2). The Court notes this account differs from Plaintiff's Complaint where he claims he suffered scraps to his face when he was "slammed" into a vehicle. (ECF No. 1, p. 5).

490 U.S. at 396. "The calculous of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-397.

Prior to the Eighth Circuit's opinion in *Chambers v. Pennycook,* 641 F.3d 898 (8th Cir. 2011), it had been an "open question in this circuit whether an excessive force claim requires some minimum level of injury." *Id.* at 904. In *Chambers,* the Eighth Circuit held "evidence of only *de minimis* injury" does not "necessarily foreclose[ ] a claim of excessive force under the Fourth Amendment." *Id.* at 906. Rather, "[t]he appropriate inquiry is 'whether the force used to effect a particular seizure is 'reasonable." *Id.* The court reasoned "it is logically possible to prove an excessive use of force" can still "cause only a minor injury," and such claims should not be foreclosed based solely on the extent of the injury suffered. *Id.*

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1081 (8th Cir. 1990), (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d. Cir. 1973). In order to conduct an arrest, some degree of force is necessary. Therefore, the fact that force is used during an arrest does not *ipso facto* establish a Fourth-Amendment violation. *Crumley v. City of St. Paul,* 324 F.3d 1003, 1007 (8th Cir. 2003) ("Fourth Amendment jurisprudence has long recognized…the right to make an arrest…necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.") (internal quotation marks and citation omitted).

"Handcuffing inevitably involves some use of force," *Wertish v. Krueger,* 433 F.3d 1062, 1067 (8th Cir. 2006), and it will almost always result in some irritation, minor injury, or discomfort where the handcuffs are applied. *See Chambers,* 641 F.3d 898, 907 citing *Rodriguez v. Farrell,*

280 F.3d 1341, 1351 (11th Cir. 2002). Courts have found the application of handcuffs, even when tightly secured, is not an unreasonable use of force. *See Crumley,* 324 F.3d at 1008; *Foster,* 914 F.2d at 1082.

On February 16, 2016, Police were informed through dispatch of an armed robbery of the Bank of the Ozarks in Hope, Arkansas. They were provided a description of the vehicle which matched the car driven by Plaintiff. The police pulled Plaintiff over, and once back up officers arrived on the scene, Plaintiff was ordered from his vehicle. Officers approached Plaintiff with their weapons drawn and ordered Plaintiff to the ground where he was handcuffed. The dash cam video of the incident demonstrates Officer Ghormley responded to Plaintiff's complaints his handcuffs were too tight by checking his handcuffs within five minutes after he was handcuffed. She can be heard on the dash cam stating, "I can get a finger in there, it's not too tight, I promise you. They're not comfortable, I know it, but I can get a finer inside of both of them, okay?"

Even though Plaintiff obeyed all verbal commands to exit his vehicle and did not resist arrest, the Court finds no reasonable jury could find that tightly placing handcuffs on Plaintiff and pushing him on the ground or against a vehicle while they were handcuffing him during his arrest was excessive use of force under the "objective reasonableness" test. Plaintiff freely admits he had just robbed a bank with a loaded gun and was leaving town when he was pulled over by police. It is more than reasonable that officers would believe Plaintiff posed an immediate threat to the safety of themselves and others after he was pulled over. Under these circumstances, the Court finds the use of force during Plaintiff's arrest was reasonable and justified. Accordingly, I recommend Defendants' summary judgment motion be granted as to Plaintiff's claims for excessive force.

17

### D.  Denial of Medical Care

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to the serious medical needs of prisoners.  *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012).  This prohibition applies equally to pretrial detainees.  *Butler v. Fletcher,* 465 F.3d 340, 345 (8th Cir. 2006).  To prevail on his, Plaintiff must prove Defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).  The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).  To establish the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct."  *Popoalii v. Correctional Medical Services,* 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).  A plaintiff must show that an official "actually knew of but deliberately disregarded his serious medical need."  *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006).  However, intentionally denying or delaying

access to medical care may constitute deliberate indifference. *See Estelle,* 429 U.S. at 104-05; *Dulany*, 132 F.3d at 1239.

When a delay in medical treatment is the alleged constitutional deprivation, the objective seriousness of the deprivation must also be measured by reference to the effect of delay in treatment. As a result, to succeed on a delay in medical treatment claim, the plaintiff "must place verifying medical evidence in the records to establish the detrimental effect of delay in medical treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (quotation marks omitted) (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)). On summary judgment, a plaintiff must offer evidence a delay in treatment had a detrimental effect. In the absence of such evidence, a plaintiff "fail[s] to raise a genuine issue of fact on an essential element of his claim." *Id.*

First, the Court is not convinced Plaintiff's wrist injury – diagnosed and described as a cyst almost a year after his arrest – is a serious medical condition. Following his arrest on February 16, 2016, Plaintiff was booked into the HCDC where it was noted he had no physical injuries. Plaintiff was also asked at that time if he had any pain or injury requiring emergency care and if he had any recent serious injury. Plaintiff responded "No" and confirmed his verbal response by signing the intake form.

Nine days after his arrest and intake at the HCDC, Plaintiff submitted a medical request after he "fell out on the lawn". He was evaluated by HCDC medical staff and did not mention anything about an injury to his wrist. A month later, Plaintiff submitted a medical request concerning a runny nose, fever, sore throat and diarrhea. He was seen by HCDC medical personnel and prescribed medication. Once again, Plaintiff did not mention anything to HCDC's medical personnel concerning an injury to his wrist. On November 5, 2016, Plaintiff was transported to

the hospital for chronic obstructive pulmonary disease with acute exacerbations.  He received treatment and returned to the HCDC.  Again, Plaintiff did not ask for any treatment for a wrist injury.

Almost a year after being incarcerated in the HCDC, Plaintiff submitted a medical request on January 25, 2017, complaining of blood vessel damage from his arrest "over a year ago".  Plaintiff was examined two days later and HCDC medical personnel noted: "right wrist 0.5 cm x 0.5 cm raised discoloration purplish grey in area – firm – (palm rt side) non-tender…"  Plaintiff's diagnosis by medical personnel was "Rt wrist calcification cyst…"  HCDC medical personnel did not prescribe any medication or treatment for Plaintiff's wrist, nor did they indicate any further action needed to be taken regarding his wrist.  After Plaintiff's diagnosis of the cyst on January 25, 2017, Plaintiff was seen by HCDC medical personnel on March 10, 2017, and transported to the hospital on April 7, 8 and 10, 2017 for medical conditions unrelated to Plaintiff's wrist.

On June 5, 2017, Plaintiff was released to the custody of the ADC.  Plaintiff was seen by ADC medical personnel on several occasions during which it was noted Plaintiff had a"2x3x1 cm vascular malformation on right wrist where IM had handcuff injury on arrest.  However, no medication or treatment was prescribed for the cyst.  Instead, Plaintiff's ADC medical records show removal of the cyst "can wait".

Even if the Court assumes for purposes of this opinion Plaintiff's wrist injury is a serious medical condition, there is no evidence Defendants Singleton or Ross were deliberately indifferent to Plaintiff's medical needs.  "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix,* 86 F.3d 761, 765 (8th Cir.1996).

20

The numerous medical requests Plaintiff submitted during his incarceration in the HCDC, demonstrate he was familiar with the HCDC's procedure requiring the submission of medical requests in order to be provided medical care.  The summary judgment record confirms Plaintiff did not submit any requests to the HCDC's medical staff pertaining to his wrist until almost a year after he was arrested.  In addition, the summary judgment record confirms Plaintiff was provided with medical care each time he submitted a medical request and was transported to hospitals when his condition required more extensive medical care than the HCDC could provide onsite.  The law is clear Plaintiff's disagreement with the HCDC medical staff's course of treatment for the injury to his wrist fails to state a claim for deliberate indifference.  *See Meuir v. Green Cnty Jail Employees*, 487 F.3d 1115, 1118-19 (8th Cir. 2007) (an inmate has no constitutional right to a particular course of treatment, and mere disagreement with the medical treatment he receives is not a basis for Section 1983 liability).  In addition, Plaintiff has failed to submit any verifiable medical evidence that a delay in the treatment of his wrist had any detrimental effect on his condition.  The medical records from the ADC indicate their medical staff did nothing different than the HCDC's staff in treating the cyst on Plaintiff wrist.  Instead, the ADC's records show the condition is not a medical emergency and is not an excessive threat to Plaintiff's health.

Accordingly, I recommend Defendants' summary judgment motion be granted as to Plaintiff's claims he was denied medical care.

### E.  Official Capacity Claims

Plaintiff also sues Defendants in their official capacities.  Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities.  *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998).  Official capacity claims are "functionally equivalent to a suit against the

21

employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, Plaintiff's official capacity claims against Defendants are treated as claims against Hempstead County. *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010).

"[I]t is well established that a municipality [or county] cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish liability on the part of Hempstead County under section 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted).

Plaintiff alleges the use of excessive force by Defendant Crider was part of Hempstead County Sheriff Department's culture, pattern and practice and there was an unwritten policy implemented by Defendants Singleton and Ross "that did not allow anyone to help get me to be seen by a doctor". The summary judgment record confirms the HCDC had written policies in place against the use of excessive force and governing how and when medical care is provided to inmates. The law is clear failure to follow an internal jail policy does not rise to the level of a section 1983 claim. *See Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996).

Plaintiff has not alleged any policy, practice, or custom of Hempstead County contributed to the alleged violation of Plaintiff's constitutional rights. Instead he argues Defendants failed to abide by the policies of the HCDC. Accordingly, Plaintiff's official capacity claims against Defendants fail as a matter of law. *Id.* [2]

---

[2] Because the Court has found Defendants did not violate Plaintiff's constitutional rights it is not necessary to address the issue of qualified immunity.

## VI. CONCLUSION

For the reasons stated above, I recommend Defendants Singleton, Ross, and Crider's Motion for Summary Judgment (ECF No. 28) be **GRANTED** and all individual and official capacity claims against Defendants be **DISMISSED WITH PREJUDICE**.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED this 24th day of March 2020.**

/s/ *Barry A. Bryant*
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE